Brent Plater (CA Bar No. 209555)
Wild Equity Institute
474 Valencia St., Suite 295
San Francisco, CA 94103
(415) 349-5787
bplater@wildequity.org

Matt Kenna (CO Bar No. 22159)
Public Interest Environmental Law
679 E. 2nd Ave, Suite 11B
Durango, CO  81301
(970) 385-6941
matt@kenna.net
Applicant *Pro Hac Vice*

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## NORTHERN DIVISION

|  |  |
|---|---|
| **WILD EQUITY INSTITUTE**, a non-profit corporation, | Case No.  3:15-cv-2461 |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. |  |
| **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** |  |
| Defendant. |  |

## INTRODUCTION

1.   In this civil action for declaratory and injunctive relief, Plaintiff Wild Equity Institute challenges Defendant United States Environmental Protection Agency's violations of Sections 7(a)(2) and 7(d) of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1536(a)(2), 1536(d). The EPA has authorized the Gateway Generating Station to emit pollution without consulting the U.S. Fish and Wildlife Service ("FWS") regarding Gateway's impacts on the endangered Lange's Metalmark Butterfly, the Antioch Dunes Evening Primrose, the Contra Costa Wallflower, and these species' designated critical habitats in violation of § 7(a)(2) of the ESA.

COMPLAINT
3:15-cv-2461

16 U.S.C. § 1536(a)(2).  The EPA also irreversibly and irretrievably committed resources into Gateway's approval before completing consultation, in violation of § 7(d) of the ESA.  16 U.S.C. § 1536(d).

2.   Plaintiff Wild Equity Institute seeks an order declaring that the EPA has violated § 7(a)(2) and § 7(d) of the ESA; an order compelling the EPA to undergo the ESA consultation process; and an order setting aside the EPA approval of Gateway's operating permit, needed to prevent irreversible and irretrievable commitment of resources through emissions that may affect the Lange's Metalmark Butterfly, the Antioch Dunes Evening Primrose, the Contra Costa Wallflower, and these species' critical habitats, until consultation is completed.

## JURISDICTION AND VENUE

3.   This court has jurisdiction over this action pursuant to 16 U.S.C. §§ 1540(c) and 1540(g) (action arising under ESA citizen suit provision).

4.   To the extent required by the ESA, 16 U.S.C. § 1540(g)(2)(A), the Wild Equity Institute provided notice of its intent to sue by letter sent to the Defendants on December 19, 2011.

5.   Venue is proper in the District Court for the Northern District of California pursuant to 16 U.S.C. § 1540(g)(3)(A), as the alleged violation occurs in this district.

## INTRADISTRICT ASSIGNMENT

6.   Assignment of this action to the San Francisco or Oakland Division is proper pursuant to Local Rule 3-2(c).  The action arises from activities in Contra Costa County.

## PARTIES

7.   Plaintiff WILD EQUITY INSTITUTE is a California non-profit corporation with its office in San Francisco.  The Wild Equity Institute unites the grassroots conservation movement and the environmental justice movement in campaigns that redress inequity, both across our human communities and towards the lands in which we live.  The Wild Equity Institute, its members, its staff, and its board of directors have long-standing interests in the Lange's Metalmark Butterfly, the Contra Costa Wallflower, and the Antioch Dunes Evening Primrose, and long-standing ties to the communities in Antioch and Pittsburg, California.

COMPLAINT
3:15-cv-2461

1    Specifically, the Wild Equity Institute, its members, staff, and Board of Directors have interests

2    in the Antioch Dunes National Wildlife Refuge and the species that depend on the refuge for

3    survival, including the Lange's Metalmark Butterfly.  The Wild Equity Institute's members,

4    staff, and Board of Directors regularly recreate at the Antioch Dunes National Wildlife Refuge

5    when it is opened for public use and participate in butterfly counts and restoration activities on

6    the land.  The Wild Equity Institute's members, staff, and Board of Directors also recreate,

7    commute, and live near Gateway, and are harmed by the air pollution it emits.

8           8.     The above-described interests in the Lange's Metalmark Butterfly, the Contra

9    Costa Wallflower, and the Antioch Dunes Evening Primrose, the lands they inhabit, and the air

10   surrounding Gateway are adversely impacted by EPA's failure to consult or reinitiate Section 7

11   consultation with the FWS regarding the effect of Gateway's emissions upon the butterfly.

12          9.     Defendant EPA is a federal agency with a non-delegated responsibility to consult

13   with the Service under Section 7 of the ESA to insure that any EPA action will not jeopardize

14   the continued existence of the Lange's metalmark butterfly, the Contra Costa Wallflower, and

15   the Antioch Dunes Evening Primrose.

16                              **APPLICABLE FACTS AND LAW**

17     **I.   The Endangered Species Act Section 7 Consultation Requirement**

18          10.    The Endangered Species Act is the most comprehensive legislation for the

19   preservation of threatened and endangered species ever enacted by any nation.  The ESA is

20   intended to "provide a means whereby the ecosystems upon which endangered species and

21   threatened species depend may be conserved, [and] to provide a program for the conservation of

22   such endangered and threatened species." 16 U.S.C. § 1531(b).  "Conservation" means the use

23   of all methods and procedures needed to bring any endangered or threatened species to the point

24   at which the protections of the ESA are no longer necessary – that is, to recover species so that

25   they no longer need legal protection. 16 U.S.C. § 1532(3).

26          11.    When a species is formally listed under the ESA as endangered or threatened, it

27   receives the full range of protections afforded by the ESA.  Section 7 of the ESA lists the steps

28   that federal agencies, such as the EPA, must take to ensure that their actions do not jeopardize

1    endangered species.  Section 7(a)(2) requires all federal agencies to "insure that any action

2    authorized, funded, or carried out by such agency (hereinafter in this section referred to as an

3    "agency action") is not likely to jeopardize the continued existence of any endangered species or

4    threatened species."  16 U.S.C.A. § 1536.  The words of Section 7 "affirmatively command all

5    federal agencies to insure that actions authorized, funded, or carried out by them do not

6    jeopardize the continued existence of an endangered species."  *TVA*, 437 U.S. at 173.

7        12.    When an action carried out, funded, or authorized by a federal agency "may

8    affect" a listed species, the action agency must consult with the FWS.  50 CFR § 402.14(a).

9    Formal consultation is required unless, if as a result of informal consultation and/or a biological

10   assessment, the agency and Service concur that the action is not likely to adversely affect any

11   listed species.  50 CFR § 402.14(b).  The formal consultation requirement involves extensive

12   review of the project and its effects on listed species, based on the best scientific and

13   commercial data available.  50 CFR § 402.14(d).

14       13.    Conversely, an agency is relieved of the obligation to consult on its actions only

15   where the action will have "no effect" on listed species or designated critical habitat. Effects

16   determinations are based on the direct, indirect, and cumulative effects of the action when added

17   to the environmental baseline and other interrelated and interdependent actions. 50 C.F.R. §

18   402.02 (definition of "effects of the action").

19       14.    At the conclusion of the formal consultation, the Service will analyze whether or

20   not the proposed action is likely to jeopardize the continued existence of the species.  50 CFR

21   402.14(g)(4).  This analysis and conclusion, or "jeopardy determination," is included in the final

22   Biological Opinion.  50 CFR 402.14(h).

23       15.    The Service must also reinitiate consultation where discretionary federal

24   involvement or control over the action has been retained or is authorized by law if (1) the

25   amount or extent of take specified in the Permit is exceeded; (2) new information reveals effects

26   of the action that may affect listed species or critical habitat in a manner or to an extent not

27   previously considered; (3) the action is modified in a manner that causes an effect that was not

28

COMPLAINT
3:15-cv-2461

considered in the biological opinion; or (4) if a new species is listed or critical habitat designated that may be affected by the action. 50 C.F.R. § 402.16.

16. After the initiation of consultation or reinitiation of consultation under ESA § 7(a)(2) and prior to completion of consultation, ESA Section 7(d) prohibits federal agencies from making any irreversible or irretrievable commitment of resources if doing so would foreclose the formulation or implementation of reasonable and prudent alternatives. 16 U.S.C. § 1536(d). This prohibition remains in effect until the procedural requirements of § 7(a)(2) are satisfied. 50 C.F.R. § 402.09.

**II. The EPA's Duty Under The Clean Air Act**

17. The Clean Air Act requires all new major stationary sources to obtain a preconstruction permit that complies with the act's new source review ("NSR") requirements. CAA § 165(a), 42 U.S.C. § 7475(a); *see also* CAA § 160, 42 U.S.C. § 7470 (defining purposes of PSD permitting program). For major sources, the NSR program is comprised of two types of preconstruction permits: prevention of significant deterioration ("PSD"), which applies to areas of the country that EPA has designated as in attainment or unclassifiable for national ambient air quality standards ("NAAQS"); and NSR, which applies to areas that are designated as nonattainment with the NAAQS.

18. Antioch, CA is within an air district designated as in attainment or unclassifiable for nitrogen dioxide ("$NO_2$" or generically "$NO_x$"), therefore major stationary sources in Antioch such as Gateway are subject to the PSD program. 40 C.F.R. § 52.21(b)(1).

19. In order to receive a PSD permit for a major source, applicants must, among other requirements, perform a thorough analysis of the air quality impacts that a proposed project will generate, and demonstrate that the project will not cause or contribute to an exceedance of any applicable NAAQS. CAA § 165(a)(3), 42 U.S.C. § 7475(a)(3); 40 C.F.R. § 52.21(k).

20. In the San Francisco Bay Area, the Bay Area Air Quality Management District ("Air District") issues PSD permits under a partial delegation agreement with EPA. Under this

COMPLAINT
3:15-cv-2461

1   agreement, the EPA administrator has delegated most responsibilities to the Air District to issue

2   PSD permits. 40 C.F.R. § 52.21(u). Nevertheless, EPA considers such permits EPA-issued.

3        21.    Per the partial delegation agreement, the Air District must "notify the Fish and

4   Wildlife Service and EPA when a submitted PSD application has been deemed complete, in

5   order to assist EPA in carrying out its non-delegable responsibilities to consult with FWS under

6   section 7 of the Endangered Species Act." Agreement for Partial Delegation of the Federal

7   Prevention of Significant Deterioration (PSD) Program Set Forth In 40 C.F.R. Section 52.21 by

8   the United States Environmental Protection Agency, Region 9 to the Bay Area Air Quality

9   Management District at § VI.2.b.

10       22.    EPA has long acknowledged that federal PSD permits, including those issued by

11  a delegated state, are federal actions within the meaning of section 7 of the ESA. *In re Indeck,*

12  *LLC*, 13 E.A.D. 127, 205 (EAB 2006) In this way, EPA must consult with the Service when a

13  permitting decision may affect listed species or designated critical habitat.

14  **III.Gateway Generating Station Permitting History**

15  23. Gateway Generating Station is a 530 megawatt combined-cycle, natural-gas fired power

16  plant located in Antioch, California, less than one mile from the Antioch Dunes NWR.

17  24. Gateway is owned and operated by Pacific Gas & Electric, a California investor-owned

18  utility.

19  25. In 2001, the Air District, under delegated authority from EPA, issued a federal PSD

20  permit (also known as an "authority to construct" permit) authorizing plant construction to

21  PG&E's predecessor, Mirant, to construct the Contra Costa Power Plant Unit 8.

22  26. The EPA initiated informal consultation and requested concurrence by the Service that

23  the Lange's Metalmark Butterfly, although identified at the time as occurring near Gateway, was

24  not likely to be adversely affected by the construction process.  The EPA did not request

25  consultation on the effects that the power plant's operations may have on listed species.

26  27. In a letter on June 29, 2001, the Service concurred with the EPA regarding the impact of

27  the construction footprint on the Lange's Metalmark Butterfly and other Dunes species, but did

28  not address effects on these species caused by the power plant's operation.

COMPLAINT
3:15-cv-2461

28. Under the authority to construct permit, Mirant's authority to construct expired two years from the date of issuance "unless substantial use of authority has begun." Mirant began construction in late 2001 but permanently ceased construction in February 2002.

29. In December 2002, EPA finalized significant, and controversial, changes to the federal PSD program. In response, the Air District informed the EPA that it could not incorporate those changes into its own regulations.

30. In March 2003, the, EPA revoked the Air District's previously delegated authority to implement the PSD program. At that point, EPA was the only entity with authority to issue or to administer PSD permits.

31. In August 2003, the 2001 PSD permit expired, some 18 months after construction ceased.

32. However, the Air District subsequently attempted to extend the effectiveness of the expired permit to July, 2005.

33. In July 2005, the Air District attempted to extend the PSD permit again.

34. In 2006, PG&E acquired the project from Mirant, and on January 18, 2007, the California Energy Commission, under its power plant siting authority, authorized PG&E to restart construction of the newly renamed Gateway Generating Station.

35. In December 2007, PG&E notified the Air District that it needed an amended permit to construct because its construction plans had changed.

36. Throughout this period, PG&E continued constructing the Gateway power plant, finishing the project in November, 2008.

37. On September 24, 2009, EPA filed a civil enforcement action in federal district court against PG&E on grounds that PG&E violated the Clean Air Act because its PSD permit authorizing construction had expired before PG&E completed construction and began operating the plant.

38. EPA and PG&E then entered into a Consent Decree to permit Gateway to continue operating.

COMPLAINT
3:15-cv-2461

39. On September 13, 2011, Gateway received a permit to operate from the Air District. The permit to operate incorporated certain PSD requirements pursuant to the federal Clean Air Act, including $NO_x$ emission limits.

40. The PTO's PSD requirements have been extended annually, and the latest extension expires in November 2015.

## NITROGEN EMISSIONS FROM THE OPERATION OF GATEWAY GENERATING STATION MAY AFFECT THE LANGE'S METALMARK BUTTERFLY

41. The Lange's Metalmark Butterfly is a brightly colored, fragile, and highly endangered butterfly that has been protected by the Federal Endangered Species Act since 1976.  41 Fed. Reg. 22,041 (June 1, 1976).   Today the species can only be found within the Antioch Dunes National Wildlife Refuge, a 67-acre protected area along the San Joaquin River's southern shore in Contra Costa County.

42. The Antioch Dunes Evening Primrose (*Oenothera deltoides* ssp. *Howellii*) is a beautiful perennial plant that blooms only for one night.  It has white flower petals with long yellow stamens, and is host to a rare sweet bee species.

43. The Contra Costa Wallflower (*Erysimum capitatum* var. *angustatum*) is a fragrant and highly structured wildflower with yellow petals.

44.  Both the Antioch Dunes Evening Primrose and the Contra Costa Wallflower have been protected as endangered species under the ESA since 1978, 43 Fed. Reg. 7,972 (April 26, 1978), and "critical habitat" has been designated for both species since 1978 as well.  43 Fed. Reg. 39,042 (Aug. 31, 1978).

45. Like the Lange's Metalmark Butterfly, the Contra Costa Wallflower and the Antioch Dunes Evening Primrose are endemic to the Antioch Dunes NWR.  Although the population sizes of these plants fluctuate, the long-term trend indicates both species are in decline.

46. Formed over 140,000 years ago, the Antioch Dunes connected to a patchwork of dune formations and other arid environments stretching across the Central Valley, eventually reaching the Mojave Desert.  But as California's climate changed this patchwork of arid land retreated, isolating the Antioch Dunes for thousands of years. Over time, the Antioch Dunes' wildlife and

COMPLAINT
3:15-cv-2461

plants evolved into new, endemic species whose closest relatives were hundreds of miles away. The isolation of this area in Antioch allowed the species found there to evolve into unique life forms found nowhere else on Earth.  Today the Antioch Dunes National Wildlife Refuge protects the remnants of these habitats, upon which three federally protected species depend: the Contra Costa Wallflower, the Antioch Dunes Evening Primrose, and the Lange's Metalmark Butterfly.

47. Between 50 to 100 years ago, the population size of the Lange's metalmark butterfly at the Antioch Dunes is estimated to have been approximately 25,000 individuals.  However, by 2006, the number had plummeted to a total of 45 adults. For the past five years, the number of adults observed in the wild has continued to remain at critically low levels.  Surveys from 2009 to 2011 revealed an average population for the species of 35 individuals in the wild.

48. The Lange's metalmark butterfly's survival and recovery is entirely dependent on the abundance and maturity of its host plant, the naked-stemmed buckwheat (*Eriogonum nudum* ssp. *Auriculatum*), which grows best in areas with adequate drainage.  The butterfly's flight period is synchronized with the buckwheat's annual bloom, and the adults preferentially nectar and perch on the plant during their week-long adult lifespan. The Lange's metalmark butterfly breeds and lays eggs on mature naked-stemmed buckwheat plants, and when the eggs hatch the caterpillars exclusively eat the mature plant's leaves. The association between the naked-stemmed buckwheat and the Lange's metalmark butterfly is so strong that scientists have observed a direct positive correlation between the abundance of mature buckwheat plants and the size of the butterfly's population.

49. Unfortunately, the Antioch Dunes National Wildlife Refuge's naked-stemmed buckwheat population is now in decline, confined to a small fraction of the Refuge, and threatened with complete extirpation from the site.  Scientific evidence developed since 2001 indicate that the buckwheat's decline is caused by the deposition of nitrogen pollution into the Antioch Dunes Wildlife Refuge.  Nitrogen ($N_2$) is a critical limiting nutrient in many ecosystems, including the Refuge's desert-like environment.  While nitrogen is abundant in the ambient air—it constitutes more than three-quarters of the Earth's atmosphere—under normal

COMPLAINT
3:15-cv-2461

conditions it is an inert gas and biologically unavailable to most organisms. However, atmospheric nitrogen becomes reactive when fossil fuel combustion occurs, particularly at high temperatures. The ensuing chemical reaction can transform atmospheric nitrogen into a variety of nitrogen oxides (generically symbolized as $NO_x$).

50. Nitrogen oxides are highly reactive: they contribute to ground-level ozone, fine particle pollution, and can cause numerous adverse effects on the respiratory system. For these reasons they are one of six "criteria" pollutants regulated by the Clean Air Act. Moreover, nitrogen oxides are biologically available to many organisms; when deposited in nitrogen-limited habitats like the Antioch Dunes National Wildlife Refuge, they literally fertilize the soil, changing the chemical foundation of the Refuge's soils.

51. The Antioch Dunes National Wildlife Refuge is heavily impacted by nitrogen deposition. Recent studies indicate that 6.51 kilograms of biologically available nitrogen pollution is deposited on each hectare of the dunes annually. This exceeds the rate at which atmospheric scientists expect significant, adverse effects are expected in naturally nutrient-poor environments like the Antioch Dunes.

52. As nitrogen compounds are deposited in the soil, the chemical composition changes, causing invasive weeds to proliferate, crowding out host plant. The substantial increase of nitrogen deposition has resulted in prolific overgrowth of non-native, invasive plant species, none of which are suitable for the breeding, feeding, and sheltering behaviors essential to the Lange's survival.

53. Today the buckwheat is only found in a limited portion of the Antioch Dunes National Wildlife Refuge, and this remaining area is threatened with extirpation due to the prolific overgrowth of non-native, invasive plant species, none of which provide food for the butterfly's caterpillar stage. Although the naked-stemmed buckwheat is not threatened with global extinction, the loss of this essential host plant at the Antioch Dunes National Wildlife Refuge will surely lead to the extinction of the Lange's Metalmark Butterfly because of the butterfly's limited range.

COMPLAINT
3:15-cv-2461

54. NO$_x$ emissions are also adversely impacting the Contra Costa Wallflower and the Antioch Dunes Evening Primrose.  As NO$_x$ is deposited into these species' critical habitats, invasive weeds begin to overgrow these endemic, endangered species, reducing the size of recovery areas and crowding out individual plants.

55. The Service recognizes the dangerous risk that nitrogen deposition can have on endangered species habitat.  Indeed, in a 2011 letter to the EPA, the Service conveyed express concerns regarding the nitrogen deposition from the continued operation of Gateway, and recommended that the EPA reinitiate Section 7 consultation.  The Service made this determination "based on the availability of new scientific information that reveals adverse effects to listed species not previously considered and based on changes to the GGS project resulting from entering into the recent settlement agreement with PG&E." Letter from Fish and Wildlife Service to Bay Area Air Quality Management District (June 29, 2011).

56. The Service stated in its letter to the EPA:

> The Service is concerned that the indirect and cumulative effects of the deposition of additional nitrogen at ADNWR resulting from operation of . . . power generating stations will result in adverse effects to the Contra Costa wallflower and the Antioch Dunes evening primrose and their critical habitat and in take of the Lange's metalmark butterfly. Adverse effects to the Lange's metalmark butterfly are of particular concern. The status of this species has declined dramatically in the last few years and because the ADNWR supports the only existing population of Lange's metalmark butterfly, any adverse effects to habitat at ADNWR may place the butterfly in danger of extinction in the foreseeable future.

57. As of this date, the EPA has not acted upon or responded to the Service's letter. By not consulting with the Service, EPA is violating the ESA through allowing the emission of habitat-altering pollution into the species' last sanctuary, the Antioch Dunes National Wildlife Refuge.

//

//

//

//

//

COMPLAINT
3:15-cv-2461

**CLAIM FOR RELIEF**

**Violation Of The Endangered Species Act**
**[16 U.S.C. § 1536(a)(2)]**
**(The EPA's Failure to Consult or Reinitiate Consultation on the Operation of the Gateway**
**Generating Station)**

58. Each and every allegation set forth above in this Complaint is incorporated herein by reference.

59. EPA has not initiated or reinitiated consultation with the Service on all affected endangered and threatened species.

60. EPA retains a non-delegated responsibility to initiate/reinitiate consultation under Section 7 of the ESA regarding the issuance of the original PSD permit to Gateway and on new PSD requirements incorporated into the 2011 Permit to Operate and extended through 2015.

61. EPA also retains a non-delegated responsibility to initiate consultation under Section 7 of the ESA over the 2011 Consent Decree between EPA & PG&E.

62. EPA is violating Section 7(a)(2) of the ESA and its implementing regulations by failing to consult with the Service and by failing to ensure through consultation that its actions regarding the Gateway facility do not jeopardize the continued existence of endangered and threatened species or destroy or adversely modify designated critical habitat. 16 U.S.C. §§ 1536(a)(2); 50 C.F.R. Part 402. This constitutes a violation of the ESA within the meaning of 16 U.S.C. § 1540(g).

63. Further, EPA is violating Section 7(d) of the ESA and its implementing regulations by making irreversible and irretrievable commitments of resources by entering agreements to continue operating Gateway without initiating, reinitiating, or completing the consultation process with Service to ensure that the EPA's action do not jeopardize the continued existence of the Lange's Metalmark Butterfly. 16 U.S.C. §§ 1536(d).

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

COMPLAINT
3:15-cv-2461

1.  Declare that the EPA is violating ESA § 7(a)(2) by failing to consult or reinitiate consultation with the Service concerning the effects of Gateway's nitrogen emissions on the Lange's Metalmark Butterfly, the Contra Costa Wallflower, the Antioch Dunes Evening Primrose, and critical habitats at the Antioch Dunes National Wildlife Refuge;

2.  Declare that the EPA is violating ESA § 7(d) by making irreversible and irretrievable commitments of resources that foreclose the EPA's ability to implement reasonable and prudent alternatives in light of recent studies linking nitrogen deposition to the decline of the Lange's Metalmark Butterfly;

3.  Order the EPA to begin consultation pursuant to ESA §7(a)(2) on the effects of Gateway on the Lange's Metalmark Butterfly, the Contra Costa Wallflower, the Antioch Dunes Evening Primrose, and critical habitats at the Antioch Dunes National Wildlife Refuge;

4.  Order the EPA to not enter into any irreversible or irretrievable commitments of resources that may preclude the implementation of reasonable and prudent alternatives to benefit the Lange's Metalmark Butterfly, the Contra Costa Wallflower, the Antioch Dunes Evening Primrose, and critical habitats at the Antioch Dunes National Wildlife Refuge until consultation is complete;

5.  Set aside EPA's operating permit in order to halt harmful emissions of nitrogen from Gateway;

6.  Award the Wild Equity Institute costs, including reasonable attorney's fees and expert witness fees; and

7.  Provide such other relief as the court deems just and proper.

//
//
//
//
//

COMPLAINT
3:15-cv-2461

Respectfully submitted June 3, 2015,

Brent Plater (CA Bar No. 209555)
Wild Equity Institute
474 Valencia St., Suite 295
San Francisco, CA 94103
(415) 349-5787
bplater@wildequity.org

Matt Kenna (CO Bar No. 22159)
Public Interest Environmental Law
679 E. 2nd Ave, Suite 11B
Durango, CO  81301
(970) 385-6941
matt@kenna.net
Applicant *Pro Hac Vice*

Attorneys for Plaintiff Wild Equity Institute

COMPLAINT
3:15-cv-2461