1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WILD EQUITY INSTITUTE,

Plaintiff,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

Defendant.

Case No.  15-cv-2461-PJH

**ORDER GRANTING MOTION TO
DISMISS**

Defendant's motion for an order dismissing the complaint for lack of subject matter jurisdiction and failure to state a claim came on for hearing before this court on October 21, 2015.  Plaintiff appeared by its counsel Brent Plater, and defendant appeared by its counsel Bridget McNeil and Julie Walters.  Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby GRANTS the motion.

**INTRODUCTION**

Plaintiff Wild Equity Institute ("Wild Equity"), a non-profit environmental group, bought this action against the United States Environmental Protection Agency ("EPA"), asserting a claim under § 7 of the Endangered Species Act, 16 U.S.C. § 1536.  Wild Equity alleges that emissions from a power plant in Contra Costa County endanger the continued existence of the Lange's metalmark butterfly, the Antioch Dunes evening primrose, and the Contra Costa wallflower ("the Listed Species"), each of which is endemic to the Antioch Dunes National Wildlife Refuge ("Antioch Dunes NWR").

# STATUTORY BACKGROUND

A.    The Endangered Species Act

The Endangered Species Act ("ESA") provides for the listing of species as threatened or endangered.  16 U.S.C. § 1533.  Section 7(a)(2) of the ESA requires federal agencies such as the EPA to

> insure that any action authorized, funded, or carried out by such agency (hereinafter . . . referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical.

16 U.S.C. § 1536(a)(2).  An agency is required to consult with either the United States Fish and Wildlife Service ("FWS") or the National Marine Fisheries Service (collectively, "the Services") whenever the agency takes action that "may affect" listed species or their habitats.  16 U.S.C. § 1536(a)(2); see also 50 C.F.R. § 402.14(a).  Section 7 applies only to actions over which there is discretionary Federal involvement or control.  50 C.F.R. § 402.03.

The regulations promulgated under the ESA define "agency action" as follows:

> Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas.  Examples include, but are not limited to: (a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02.

In considering whether there has been an "agency action," courts in the Ninth Circuit employ a two-part test:  "First, we ask whether a federal agency affirmatively authorized, funded, or carried out the underlying activity.  Second, we determine whether the agency had some discretion to influence or change the activity for the benefit of a protected species."  Karuk Tribe of Cal. v. U.S. Forest Serv., 681 F.3d 1006, 1021 (9th Cir. 2012) (en banc).

If the agency determines that its action "may affect" endangered or threatened species or critical habitat, it must pursue either informal or formal consultation with one of

2

1   the Services.  See 50 C.F.R. §§ 402.13-402.14.  Formal consultation is required unless

2   the agency determines, as a result of informal consultation with the Service, "that the

3   proposed action is not likely to adversely affect any listed species or critical habitat."  Id.

4   § 402.13(a).  If formal consultation is required, the Service prepares a Biological Opinion

5   stating whether the proposed action is likely to "jeopardize the continued existence of

6   listed species or result in the destruction or adverse modification of critical habitat."  Id.

7   § 402.14(g).  Thereafter, the agency must determine how to proceed with its action in

8   light of the Service's Biological Opinion.  Id. § 402.15.

9        The ESA's citizen suit provision authorizes any person to "commence a civil suit

10  on his own behalf . . . to enjoin any person, including the United States and any other

11  governmental instrumentality or agency . . . who is alleged to be in violation of any

12  provision of this chapter or regulation issued under the authority thereof."  16 U.S.C.

13  § 1540(g)(1)(A).  The citizen suit provision also provides that "district courts shall have

14  jurisdiction . . . to enforce any such provision or regulation."  Id. § 1540(g).

15  B.   The Clean Air Act[1]

16       Title I of the Clean Air Act is designed to ensure that air quality in the United

17  States attains and maintains National Ambient National Ambient Air Quality Standards

18  ("NAAQS"), which are health-based standards for the amount of air pollutant in the

19  ambient air.  42 U.S.C. § 7409.  The New Source Review ("NSR") program of the Clean

20  Air Act divides the nation into "attainment" areas, which have attained NAAQS, and "non-

21  attainment" areas, which have not attained the standards.  42 U.S.C. §§ 7470-7515.  The

22  Act requires that all new major stationary sources obtain a preconstruction permit that

23  complies with the Act's NSR requirements.  42 U.S.C. §§ 7470, 7475(a).

24       Areas designated as either "non-attainment" or "unclassifiable" are subject to

25  requirements to bring them into attainment, including the non-attainment NSR permitting

26

27  _____

28  [1]  The complaint alleges a single cause of action under the ESA.  The court includes this
    discussion of the Clean Air Act to make the discussion of the factual and procedural
    background more comprehensible.

1    provisions. Id. §§ 7501-7515. Attainment areas, by contrast, are subject to the

2    Prevention of Significant Deterioration ("PSD") permitting provisions. See Alaska Dep't of

3    Envtl. Conservation v. Envtl. Prot. Agency, 540 U.S. 461, 469-75 (2004).

4         States are encouraged to develop their own regulatory approaches for

5    implementing the NSR and PSD programs. See United States v. Pac. Gas & Elec., 776

6    F.Supp. 2d 1007, 1012 (N.D. Cal. 2011) ("PG&E"). Regulatory programs developed by

7    the states, and known as "State Implementation Plans" ("SIPs"), are intended to satisfy

8    the minimum requirements of the Clean Air Act. See generally 42 U.S.C. § 7410(a). A

9    state's SIP "may not adopt or enforce any emission standard or limitation which is less

10   stringent" than the Act's requirements. 42 U.S.C. § 7416. Each SIP is required to

11   contain preconstruction permitting requirements for major stationary sources, including

12   the PSD permitting requirements that apply in attainment and non-attainment areas. See

13   42 U.S.C. §§ 7410(a)(2)(C), 7470-7515. PSD permits issued by states under approved

14   SIPs are actions under state law. In re Milford Power Plant, 8 E.A.D. 670, 673, 1999 WL

15   1120154 at *3-4 (EAB Oct. 18, 1999).

16        California has adopted the SIP approach in the San Francisco Bay Area with

17   respect to the non-attainment NSR program of the Clean Air Act, but not with respect to

18   the attainment area PSD program. See PG&E, 776 F.Supp. 2d at 1021. For non-

19   attainment NSR, the Bay Area Air Quality Management District ("BAAQMD"), an agency

20   with jurisdiction in the nine Bay Area counties, see Cal. Health & Saf. Code §§ 40200-

21   40276, has adopted regulations and has had those regulations approved by the EPA.

22   See 64 Fed. Reg. 3850 (Jan. 26, 1999), 40 C.F.R. §§ 52.21, 52.22(c)(199)(i)(A)(8)).

23   These "SIP-approved" non-attainment NSR regulations are set forth in BAAQMD

24   Regulation 2, Rule 2.

25        As California has not adopted its own regulatory system to implement the Clean

26   Air Act's PSD requirements in the Bay Area, PSD permitting is governed by federal

27   regulations which are codified at 40 C.F.R. § 52.21, and which incorporate the procedural

28   regulations at 40 C.F.R. Part 124. These regulations provide for the EPA to delegate its

United States District Court
Northern District of California

4

authority to conduct PSD source review and issue PSD permits.  See 40 C.F.R. 52.21(u).  Where such a delegation occurs, the PSD permits issued by the delegate agency remain federal and, as described below, are subject to EPA's regulations governing administrative appeals and exhaustion of administrative remedies.  The delegate agency is simply authorized to issue the permits under federal law on EPA's behalf, rather than issuing PSD permits under state law as in a state with an approved PSD program in its SIP.  Milford Power, 8 E.A.D. at 673-74.

On April 23, 1986, the EPA delegated to BAAQMD the "authority of the administrative and enforcement elements" of the federal PSD program's implementing regulations, subject to the terms, conditions and reservations of authority set forth in that agreement.  PG&E, 776 F.Supp. 2d at 1012.  BAAQMD also implements a separate SIP-approved Clean Air Act program under state and local law, pursuant to which it issues preconstruction or "Authority to Construct" ("ATC") permits, to implement the Clean Air Act non-attainment NSR program.  Id.  Although BAAQMD implements these programs in parallel, the PSD and ATC requirements are distinct, with the latter being implemented under state and local law and the former under federal law.

Under the PSD permitting program, new proposed major sources of pollution must obtain a permit before construction.  See 42 U.S.C. §§ 7470–7492.  A PSD permit must be supported by an air quality impact analysis that shows that the increased emissions will not cause or contribute to an exceedance of the NAAQS or air quality increments in the area.  See 42 U.S.C. § 7475(a)(3).  In addition, PSD applicants must show they will apply the Best Available Control Technology ("BACT") to minimize pollution.  See 42 U.S.C. §§ 7475(a)(4), 7479(3).

Under federal regulations, PSD permits expire when 18 months elapse from the time of issuance without construction.  40 C.F.R. § 52.21(r)(2).  Expiration ensures that major polluting sources use the most up-to-date pollution control technology.  See Sierra Club v. Franklin Cty. Power of Illinois, 546 F.3d 918, 934 (7th Cir. 2008).  The 18-month period specified in section 52.21(r)(2) may be extended "upon a satisfactory showing that

an extension is justified." 40 C.F.R. § 52.21(r)(2).  By contrast, BAAQMD's state-law

construction permit regulations allow for a longer period before expiration of an ATC.

PG&E, 776 F.Supp. 2d at 1013; see BAAQMD Reg. 2-1-407 (ATC permit "that has not

expired after two years, due to substantial use or renewal, shall expire after four years,"

referred to as "the Four-Year Rule").

## FACTUAL AND PROCEDURAL BACKGROUND

On July 24, 2001, pursuant to its delegation agreement with the EPA, BAAQMD

issued a PSD permit ("2001 PSD Permit") combined with an ATC permit under state and

local law ("2001 ATC Permit"), authorizing Mirant to construct a natural gas-fired power

plant – the Contra Costa Power Plant Unit 8 – in Antioch, California.  The location of the

proposed power plant was less than one mile from the Antioch Dunes NWR.  See PG&E,

776 F.Supp. 2d at 1011-14.

Because the PSD permit was a federal permit issued by BAAQMD on the EPA's

behalf, the EPA first conducted and concluded an informal ESA § 7 consultation with

FWS.  See id. at 1023 & n.7 (citing documents submitted by Wild Equity in PG&E case

showing that prior to issuance of PSD permit, the EPA consulted with FWS about various

listed species, including the three Listed Species, and whether any listed species were

likely to be adversely affected by the construction project).

In a June 29, 2001 letter, the FWS concurred with the EPA that the three Listed

Species in the Antioch Dunes NWR were not likely to be adversely affected by the

issuance of the PSD permit.  Based on the ATC provisions in state and local law, the

permit document stated that it expired in two years "unless substantial use of authority

has begun." Id. at 1013.  Mirant began construction in late 2001 but permanently ceased

construction in February 2002.  Id.

In December 2002, the EPA promulgated regulations implementing fundamental

changes to the federal PSD program.  Id.  In response, BAAQMD informed the EPA that

it could not incorporate those changes into its own regulations.  Id.  In March 2003, the,

EPA revoked BAAQMD's previously delegated authority to implement the PSD program.

1    At that point, the EPA was the only entity with authority to issue or to administer PSD

2    permits.  Id. at 1013-14.

3         In August 2003, the 2001 PSD Permit expired, some 18 months after construction

4    had ceased.  Notwithstanding both the EPA's revocation of BAAQMD's delegated federal

5    authority and the expiration of the PSD permit under federal regulations, BAAQMD wrote

6    to Mirant in October 2003, reciting BAAQMD's Regulation 2-1-407 (the Four Year Rule)

7    and asking for documentation that Mirant had satisfied the criteria for "substantial use"

8    referenced in the original 2001 ATC Permit document.  Id. at 1014.  BAAQMD apparently

9    accepted Mirant's demonstration of "substantial use" so that, under state and local

10   regulations, the 2001 ATC Permit could remain effective until 2005.  Id.  The distinct

11   federal PSD permit expiration provision was not considered at that time.

12        On June 21, 2004, the EPA partially redelegated PSD authority to BAAQMD.  The

13   redelegation agreement provided authority to issue new permits and to make

14   "administrative" or "minor" modifications to existing PSD permits specifically identified in

15   the redelegation agreement (which included Mirant's 2001 PSD permit).  Id.  In July 2005,

16   BAAQMD purported to extend the 2001 construction permit again, without distinguishing

17   between the PSD and the ATD components.  Id.

18        In 2006, PG&E acquired the project from Mirant, and on January 18, 2007, the

19   California Energy Commission ("CEC") under its power plant siting authority, authorized

20   PG&E to restart construction of the newly renamed Gateway Generating Station

21   ("Gateway").  Id.  In December 2007, PG&E notified BAAQMD that it required an

22   amended ATC permit because its construction plans had changed.  Throughout this

23   period, PG&E continued constructing the Gateway power plant, finishing the project in

24   November 2008.  Id. at 1014-15.

25        In 2009, the EPA and PG&E entered into negotiations regarding alleged violations

26   of the Clean Air Act's PSD requirements concerning the construction and operation of

27   Gateway without a valid PSD permit, as the EPA took the position that the federal 2001

28   PSD Permit had expired in 2003.  Id. at 1011, 1014.  The negotiations resulted in a

United States District Court
Northern District of California

7

1   proposed consent decree, in which PG&E agreed to a reduction in emissions of two

2   pollutants emitted by the power plant – nitrogen oxide or NOx, and carbon monoxide or

3   CO – to levels that represented emissions achieved through application of BACT.  Id. at

4   1015.

5          On September 24, 2009, the EPA filed the complaint in the PG&E case, a civil

6   enforcement action pursuant to §§ 113(b)(2) and 167 of the Clean Air Act, alleging that

7   PG&E had violated the Clean Air Act because its PSD permit authorizing construction

8   had expired before PG&E completed construction and began operating the plant.  See id.

9   at 1010.  Also on September 24, 2009, the EPA lodged the proposed consent decree

10  with the court.

11         After filing the lawsuit, the EPA reviewed certain emissions data from Gateway to

12  address concerns expressed by Communities for a Better Environment ("CBE"), which

13  had intervened in the case in March 2010.  Id. at 1015.  Based on that review and with

14  the participation of CBE, the consent decree was renegotiated (though still opposed by

15  CBE).  Id. at 1015-16.  The second amended proposed consent decree imposed

16  emissions limitations and requirements more stringent than those required under the

17  2001 PSD Permit, but did not require that PG&E undergo a new PSD permitting process.

18  Id. at 1015-16, 1027.

19         In December 2010, some 15 months after public notice of the settlement, two

20  months after the parties had filed briefs in connection with the motion for entry of the

21  second amended proposed consent decree, and only three weeks before the hearing on

22  the motion, Wild Equity moved to intervene in the PG&E case.  Id. at 1019.  Wild Equity

23  sought to file a complaint alleging that the EPA's settlement and the proposed consent

24  decree constituted an "agency action" under the ESA, and that the EPA had violated ESA

25  § 7(a)(2) by failing to consult with the FWS before agreeing to the terms of the negotiated

26  settlement and consent decree.  See id. at 1016.

27         The court denied the motion to intervene, holding that a citizen may intervene as

28  of right in a Clean Air Act enforcement action by the EPA only for purposes of enforcing

United States District Court
Northern District of California

1    compliance with the Act, but that in the case before it, Wild Equity sought to intervene to

2    assert ESA claims against the EPA, and there was thus no statutory right to intervene

3    under the Clean Air Act.  Id. at 1016-18.  The court also found that Wild Equity's motion

4    did not satisfy the requirements for intervention as of right under Federal Rule of Civil

5    Procedure 24(a) – in particular that Wild Equity lacked a significant protectable interest in

6    the asserted ESA § 7(a)(2) claim, as the proposed amended consent decree was not an

7    "agency action."  Id. at 1018-24.

8           After evaluating CBE's objections to the proposed consent decree, the court

9    issued an order on March 3, 2011, denying Wild Equity's motion to intervene and

10   entering the second amended consent decree ("Consent Decree").  Id. at 1029.  The

11   court rejected CBE's argument that the settlement was unfair because it did not require

12   that PG&E undergo a new PSD permitting process, noting that "there is nothing that

13   mandates such a process," and "find[ing] the United States' reasons for structuring the

14   settlement in this fashion to be reasonable."  See id. at 1026-30.  CBE did not appeal the

15   order approving entry of the Consent Decree, and Wild Equity did not appeal the denial of

16   its motion for leave to intervene.

17          While the Consent Decree did not require a new or revised PSD permit for

18   Gateway, it did include specific requirements for permanently incorporating the Consent

19   Decree's new emission limitations and related requirements into appropriate state and

20   local permits.  Those emission limitations and requirements were more stringent than the

21   terms and conditions imposed in the previously issued PSD permit.

22          Specifically, ¶ 6 of the Consent Decree required PG&E to petition the CEC to

23   amend the Conditions of Certification for the Gateway facility to incorporate the new

24   emission limitations and requirements imposed by the Consent Decree into the state

25   CEC authorization process.  Separately, ¶ 7 of the Consent Decree required PG&E to

26   apply to BAAQMD to amend its Permit to Operate, issued under state and local law, to

27   include the new emission limitations and requirements.

28          PG&E subsequently submitted an application to BAAQMD, to amend the PTO to

include the new emissions limitations and requirements as provided in the Consent Decree.  On September 13, 2011, BAAQMD issued Gateway a PTO, including the new terms ("2011 Permit").  See Cplt ¶ 39.  In so doing, BAAQMD acted pursuant to its own authority under state and local law and was not relying on delegated federal authority to apply 40 C.F.R. § 52.21.

On June 3, 2015, more than four years after the court denied Wild Equity's motion for leave to intervene in the PG&E case, and approved entry of the Consent Decree, Wild Equity filed the complaint in the present action, asserting violations of the ESA.  Wild Equity alleges that the deposition of nitrogen pollution (NOx) into the Antioch Dunes NWR, caused by fossil fuel combustion in the Gateway power plant, is adversely impacting the Listed Species.  Cplt ¶¶ 48-54.

Wild Equity contends that the FWS recognizes the dangerous risk that nitrogen deposition can have on endangered species habitat, and that in a letter dated June 29, 2011, the FWS conveyed concerns to BAAQMD regarding adverse effects on the three Listed Species caused by nitrogen deposition from the continued operation of Gateway, "based on changes to the [Gateway] project resulting from entering into the recent settlement agreement with PG&E."  FWS recommended that the EPA reinitiate ESA § 7 consultation.  Cplt ¶¶ 55-56.  However, Wild Equity asserts, the EPA has not responded to this letter.  Cplt ¶ 57.

The complaint alleges a single cause of action against the EPA, under ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2), for "failure to . . . reinitiate consultation on the operation of the Gateway Generating Station."  See Cplt ¶¶ 58-63.[2]  Wild Equity asserts that the EPA retains a non-delegated responsibility to reinitiate consultation under § 7(a)(2), with regard to the issuance of "the original PSD permit to Gateway" – i.e., the 2001 PSD Permit – and with regard to new PSD requirements incorporated into the 2011 Permit to

---

[2]  The complaint also asserts "failure to consult," but Wild Equity has clarified that it is not pursuing that claim, nor any claim under § 7 that the EPA had a responsibility to "initiate consultation" with regard to the Consent Decree.

10

1    Operate and extended through 2015.  Cplt ¶¶ 60-61.

2         Wild Equity alleges that the EPA is violating ESA § 7(a)(2) by failing to consult with

3    the FWS and by failing to ensure through consultation that its actions regarding the

4    Gateway facility do not jeopardize the continued existence of endangered and threatened

5    species or destroy or adversely modify designated critical habitat.  Cplt ¶ 62.[3]  Wild

6    Equity seeks declaratory and injunctive relief, an order setting aside the EPA's operating

7    permit in order to halt harmful emissions of nitrogen from Gateway.

8                                    **DISCUSSION**

9    A.    Legal Standards

10              1.    Dismissal for lack of subject matter jurisdiction

11         Federal courts are courts of limited jurisdiction.  Unlike state courts, they have no

12   "inherent" or "general" subject matter jurisdiction.  They can adjudicate only those cases

13   which the Constitution and Congress authorize them to adjudicate – those involving

14   diversity of citizenship or a federal question, or those to which the United States is a

15   party.  Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 380-81 (1994).  The

16   burden of establishing jurisdiction rests on the party asserting jurisdiction.  Id. at 377.

17   Lack of subject matter jurisdiction is never waived, and may be raised by either party or

18   the court at any time.  Attorneys Tr. v. Videotape Computer Prods., Inc., 93 F.3d 593,

19   594-95 (9th Cir. 1996).

20         On a Rule 12(b)(1) motion to dismiss, the applicable standard turns on the nature

21   of the jurisdictional challenge.  A defendant may either challenge jurisdiction on the face

22   of the complaint or provide extrinsic evidence demonstrating lack of jurisdiction on the

23   facts of the case.  White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).  In evaluating a

24   facial attack on jurisdiction, the court must accept the factual allegations in plaintiff's

25   complaint as true.  See Miranda v. Reno, 238 F.3d 1156, 1157 n.1 (9th Cir. 2001).

26

27   _____

28   [3]  The complaint appears to allege a violation of ESA § 7(d), but Wild Equity has
     disavowed any such claim.

2.      Dismissal for failure to state a claim

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint.  Ileto v. Glock, Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  While review is generally limited to the contents of the complaint, the court can also consider a document on which the complaint relies if the document is central to the claims asserted in the complaint, and no party questions the authenticity of the document.  See Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007).

To survive a motion to dismiss for failure to state a claim, a complaint generally must satisfy only the minimal notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2).  A complaint may be dismissed for failure to state a claim if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory.  Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).  While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted.  Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).

A motion to dismiss should be granted if the complaint does not proffer enough facts to state a claim for relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 558-59 (2007).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  Iqbal, 556 U.S. at 678.  Where dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment.  Sparling v. Daou, 411 F.3d 1006, 1013 (9th Cir. 2005).

B.      Defendant's Motion

The EPA seeks an order dismissing the complaint for lack of subject matter jurisdiction and failure to state a claim.  As Wild Equity has clarified that there is no viable claim for "failure to consult" or "failure to initiate consultation" (with regard to the 2011 Consent Decree, or otherwise), and no viable claim for violation of § 7(d), what remains

are two claims under § 7(a)(2) – that the EPA failed to reinitiate consultation regarding the issuance of the original 2001 PSD Permit to Gateway, and that the EPA failed to reinitiate consultation on the new PSD requirements incorporated into the 2011 Permit to Operate extended through 2015.

An agency is required to reinitiate consultation on a proposed action "where discretionary Federal involvement or control over the action has been retained or is authorized by law," and

> (a) . . . the amount or extent of taking specified in the incidental take statement is exceeded;
>
> (b) . . . new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
>
> (c) . . . the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or
>
> (d) . . . a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16.[4]

Here, Wild Equity's basis for seeking reinitiation of consultation is that "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."  50 C.F.R. § 402.16(b).  This "new information" is a reference to the June 29, 2011 letter from FWS to the EPA.  See Cplt ¶¶ 55-57; see also Doc. 27, Plaintiff's Response to Motion to Dismiss ("Pltf's Opp.") at 2-4 (citing statement in FWS letter that "[n]ew scientific information relating to the adverse effects of nitrogen deposition on listed species and natural ecosystems has become

---

[4]   Although § 402.16 is entitled "Reinitiation of Formal Consultation," the reinitiation requirement applies to both formal and informal consultation.  Conservation Cong. v. Finley, 774 F.3d 611, 618 (9th Cir. 2014) (citing Forest Guardians v. Johanns, 450 F.3d 455, 458 (9th Cir. 2006)).  However, even assuming the other provisions are met, 50 C.F.R. § 402.16 does not require agencies to stop and reinitiate consultation for "every modification of or uncertainty in a complex and lengthy project."  Id. (citing Sierra Club v. Marsh, 816 F.2d 1376, 1388 (9th Cir. 1987)).

United States District Court
Northern District of California

1  available since 2001 when the original permits were issued and consultation with the

2  Service was concluded").

3      The EPA argues that both parts of Wild Equity's reinitiation claim must be

4  dismissed.  First, the EPA argues that Wild Equity cannot maintain a claim that the EPA

5  failed to reinitiate consultation regarding the issuance of the original 2001 PSD Permit to

6  Gateway, because the 2001 Permit expired in August 2003 and cannot be the "agency

7  action" over which the EPA retains discretionary involvement or control or upon which

8  any reinitiation duty can be derived, and Wild Equity has identified no other "agency

9  action" that could provide a basis for the claim.

10      The EPA contends that the purpose of reinitiation of consultation is to ensure that

11  the underlying agency action addressed in the initial consultation remains compliant with

12  ESA Section 7, notwithstanding new information or changed circumstances such as a

13  new species listing or critical habitat designation.  See 50 C.F.R. § 402.16.  The EPA

14  asserts that it makes no sense to require a consultation by the EPA with the Service on

15  the question of whether old actions, which no longer govern anything, have any effect on

16  endangered species or their habitat.  The EPA also contends that any claim of failure-to-

17  initiate is time-barred, under the applicable statute of limitations, 28 U.S.C. § 2401(a),

18  and that it thus does not retain discretion to modify expired federal PSD permits for the

19  benefit of listed species.

20      Second, the EPA similarly asserts that Wild Equity cannot maintain a claim that

21  the EPA failed to reinitiate consultation on the new PSD requirements incorporated into

22  the 2011 Permit to Operate, because Wild Equity has failed to identify an "agency action"

23  over which there is discretionary Federal involvement or control.  In particular, the EPA

24  argues, because the 2011 PTO was issued by BAAQMD, not by the EPA, there is no

25  federal action upon which Wild Equity can seek reinitiation of consultation.  The EPA also

26  contends that because the incorporation of emission limitations and requirements was a

27  direct result of the implementation of the Consent Decree, this part of the claim amounts

28  to an attempt to evade the res judicata effect of the ruling in the PG&E decision that

United States District Court
Northern District of California

1    consultation was not required on the Consent Decree.

2         In opposition, Wild Equity argues that the relevant "agency action" here is not the

3    issuance of a particular permit, but rather the emissions of the Gateway power plant,

4    which Wild Equity claims are "authorized" by the EPA through the EPA's "permitting

5    activities as a whole." Wild Equity cites the examples in the definition of "action" in 50

6    C.F.R. § 402.02(c)-(d), which include "the granting of . . . permits" and "actions directly or

7    indirectly causing modifications to the land, water or air."

8         In addition, Wild Equity asserts that even if the 2001 Permit has lapsed, the terms

9    of the Consent Decree "resurrected" it. Wild Equity contends that since the entry of the

10   Consent Decree, both the EPA and its delegated agent in the Bay Area, BAAQMD, have

11   issued permits to Gateway that demonstrate that the facility's PSD permit is still in effect.

12        Wild Equity claims that BAAQMD issues a permit to Gateway every year called the

13   "Authority to Construct/Permit to Operate" ("ATC/PTO"), with the most recent such permit

14   (issued on October 16, 2014) allowing Gateway to operate during 2015. Wild Equity

15   asserts that the 2015 ATC/PTO states that portions of the permit are derived from the

16   EPA's PSD permit, and contends that those portions specifically authorize nitrogen

17   emissions, and that the ATC/PTO contains a separate provision that specifically limits the

18   decree-imposed pollution control provisions that apply to Gateway beyond what is

19   permitted through the PSD permit. Wild Equity argues that these requirements emanate

20   from Gateway's PSD permitting requirements rather than organically from the Consent

21   Decree itself. Wild Equity claims that if PSD permitting requirements either no longer

22   exist, or were supplanted by the organic requirements of the Consent Decree, the

23   ATC/PTO would not include this express distinction.

24        Wild Equity also contends that the EPA retains "discretionary involvement or

25   control" over its permitting authority for the Gateway plant, so that it can act to adjust

26   emissions at the plant or impose mitigation if the consultation shows that changes must

27   be made to protect the three Listed Species. Wild Equity cites the PG&E decision, where

28   the court noted that the EPA indicated at the hearing on Wild Equity's motion to intervene

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1  that it "retains the authority to seek to modify the [c]onsent [d]ecree after it [was] issued."

2  See PG&E, 776 F.Supp. 2d at 1024 n.9.  Thus, Wild Equity argues, to the extent the

3  Consent Decree would need to be amended to account for any emissions changes, the

4  EPA has "conceded" it has that ability.

5        Wild Equity argues that the applicable law shows that the EPA does retain such

6  discretion.  In support, Wild Equity cites Turtle Is. Restoration Network v. Nat'l Marine

7  Fisheries Serv., 340 F.3d 969, 977 (9th Cir. 2003); Natural Res. Def. Council v. Jewell,

8  749 F.3d 776, 783-85 (9th Cir. en banc), cert den. sub nom Glenn-Colusa Irrigation Dist.

9  v. Natural Res. Def. Council, 135 S.Ct. 676 (2014); Cottonwood Envtl. Law Ctr. v. U.S.

10  Forest Serv., 789 F.3d 1075, 1086 (9th Cir. 2015).

11        The court finds that the motion must be GRANTED as to both parts of Wild

12  Equity's § 7(a)(2) claim.  The claim that the EPA failed to reinitiate consultation regarding

13  the issuance of the original PSD permit to Gateway must be dismissed, because there is

14  no authorized agency action upon which the EPA could reinitate consultation.

15        A claim that an agency has violated § 7(a)(2) necessarily entails an allegation that

16  the agency undertook an "agency action," and that such action was improper because it

17  was taken without the agency's having first engaged in consultation.  See Ctr. for

18  Biological Diversity v. Chertoff, 2009 WL 839042 at *5 n.2 (N.D. Cal., Mar. 30, 2009).

19  While the term "action" in 50 C.F.R. Part 402 is broadly defined to include "all activities or

20  programs of any kind authorized, funded, or carried out, in whole or in part, by Federal

21  agencies . . . ." 50 C.F.R. § 402.02, nothing in the ESA or the regulations suggests that

22  power plant emissions can be considered "activities or programs . . . authorized or carried

23  out" by the EPA or any other federal agency.  The subsequent effect of a prior agency

24  action is not itself an "agency action" that triggers ESA § 7 consultation.  See Karuk

25  Tribe, 681 F.3d at 1021; Cal. Sportfishing Prot. Alliance v. FERC, 472 F.3d 593, 597-98

26  (9th Cir. 2006).

27        Although Wild Equity insists that the agency "action" as to which it seeks

28  reinitiation of consultation is not a "permit," the court finds that the only possible activity or

16

program that could be considered an "action" of the EPA is the issuance of the 2001 Permit. However, because the 2001 Permit expired in 2003, no "discretionary Federal involvement or control over the action has been retained or is authorized by law" as required under 50 C.F.R. § 402.16.[5] The fact that the EPA stated at a hearing in the PG&E case that it "retains the authority to seek to modify the [C]onsent [D]ecree after it is entered" is irrelevant to the question whether it retains discretionary involvement or control over an "action" as to which Wild Equity can legitimately seek reinitiation of consultation, not least because the Consent Decree is not an "agency action" under the ESA. PG&E, 776 F.Supp. 2d at 1023.

Further, the question of appropriate additional emission limits, and the mechanism for imposing such limits, was addressed and resolved through the entry of the Consent Decree, which in turn resolved the Clean Air Act enforcement action filed by the EPA. Thus, any attempt to compel the EPA to consult on the NOx emission rates that were set in the Consent Decree can be viewed only as an attempt to relitigate an issue that was resolved by the PG&E court, which found the Consent Decree and its limits on emissions to be fair, adequate, and reasonable, and further found nothing that mandated a new permitting process. See PG&E, 776 F.Supp. 2d at 1024-27.

Neither the entry of the Consent Decree nor the denial of Wild Equity's motion to intervene was ever challenged on appeal. Wild Equity has stated no basis for vacating or amending the Consent Decree to impose more stringent restrictions on the allowed emissions, and no basis for a new action case that in essence seeks to attack the

---

[5]     In addition, even assuming Wild Equity could identify a federal PSD action that might be subject to review, any assertion that the EPA violated the ESA in conjunction with the issuance of a federal PSD permit would necessarily challenge an alleged EPA final action taken pursuant to the Clean Air Act. Such actions are subject to judicial review only in the applicable court of appeals, not the district court. See Harrison, 446 U.S. at 586; Sierra Pac. Power Co. v. EPA, 647 F.2d 60, 62 n.2 (9th Cir. 1981) (recognizing that Clean Air Act § 307(b)(1) encompasses "any final EPA action"). Thus, the court would lack jurisdiction to adjudicate any such claim. See City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 336 (1958); Carpenter v. Dep't of Transp., 13 F.3d 313, 316 (9th Cir. 1994).

United States District Court
Northern District of California

1    provisions of the Consent Decree in the guise of demanding that the EPA "reinitiate"

2    consultation as to the very same pollutants that were at issue in the prior case.

3            The incorporation of PSD permit conditions into state and local agency permits

4    does not mean that the expired 2001 PSD permit is still in effect.  To the extent that Wild

5    Equity is now arguing that certain elements of BAAQMD's PTO are not, in fact, "new PSD

6    requirements," but rather are the same requirements from the 2001 permit – that the

7    admittedly expired PSD permit somehow retains sufficient vitality upon which to premise

8    an ESA reinitiation claim – a later permitting action taken by a separate local authority

9    under state and local law cannot legally "resurrect" an expired federal PSD permit.

10          The 2014 PTO, the most recent PTO issued by BAAQMD, may (as Wild Equity

11   claims) cite certain limits that were first established in the 2001 combined ATC/PSD

12   permit.  However, this does not mean that the 2001 expired permit still governs

13   Gateway's operations or that the EPA has discretion to reopen the expired PSD permit to

14   modify it for the benefit of the species.  The requirements of BAAQMD's 2014 PTO are

15   factually and procedurally distinct from those of the expired 2001 permit.  More

16   importantly, for purposes of ESA § 7, the key question is whether there is a federal

17   agency "action," not whether a later non-federal permit  incorporates substantially the

18   same requirements included in a prior federal action.

19          With the expiration of the 2001 PSD permit, the combined ATC/PSD permit for

20   Gateway no longer served as a PSD permit.  That is, the PSD element of the prior

21   combined permit expired; and, as the EPA argues, following the entry of the Consent

22   Decree, the PSD permit for Gateway has not been renewed, reissued, or otherwise

23   revived.  Even though the PSD portion of the prior permit expired, the state-law ATC

24   component of the combined permit remained in effect, and its provisions were later

25   carried over in the BAAQMD's PTOs for Gateway.  The BAAQMD's actions in continuing

26   to implement the state-law ATC and the subsequent issuance of the PTOs for Gateway

27   under state and local law do not serve as PSD permitting actions. Therefore, the

28   BAAQMD's 2014 PTO does not show a continuing effect of, or EPA's discretionary

1    control over, the expired 2001 PSD permit.

2        Nor is "discretion" itself an "action" that can resurrect the 2001 permit.  Wild Equity

3    several times suggests in its opposition that the mere existence of the EPA's "permitting

4    authority," "permitting activities as a whole," or the "PSD program" generally constitutes

5    the "action" that gives rise to an EPA obligation to reinitiate consultation, and also

6    suggests that the existence of "discretion" to reopen or modify a PSD permit, generally,

7    shows that EPA retains discretionary control over the 2001 PSD permit here.

8        The duty to engage in ESA consultation is triggered only by an affirmative agency

9    act or authorization; the mere existence of unexercised authority to take additional action

10   is insufficient.  See Cal. Sportfishing, 472 F.3d at 599; Karuk Tribe, 681 F.3d at 1021).

11   "[E]ven where an agency has discretion to change the terms of an existing license, the

12   agency has no duty to consult in light of such retention of discretion, when it has not

13   exercised such discretion."  Ellis v. Bradbury, 2014 WL 1569271, at *12 (N.D. Cal. Apr.

14   18, 2014) (citing Cal. Sportfishing, 472 F.3d at 594-95).  Put another way, the

15   consultation duty is triggered only when the agency affirmatively exercises that discretion

16   to act.  See Ctr. for Biological Diversity v. Envtl. Prot. Agency, 65 F. Supp. 3d 742, 758

17   (N.D. Cal. 1014).

18       The cases cited by Wild Equity are inapposite.  In Turtle Is., 340 F.3d at 977, the

19   court held that discretion remains where permitting activity has an "ongoing and lasting

20   effect."  However, the agency action was the "continued issuance of fishing permits," and

21   there was no question that the permits at issue were currently governing the fishing

22   vessels' activities and that the agency was continuing to issue permits.

23       In Jewell, 749 F.3d at 783-85, the court held that even though the  government

24   and the parties had entered binding settlements controlling the amount of water

25   government must provide to the parties, government retained at least "some discretion"

26   to act to protect species as result of ESA consultation.  However, the relevant action was

27   the Bureau of Reclamation's renewal of long-term water delivery contracts, and there was

28   no question that the contracts were in effect at the time of the challenge and were

1    governing water delivery operations.

2         In Cottonwood, 789 F.3d at 1086, the court observed that nothing in the ESA or its

3    implementing regulations  limits reinitiation to situations where there is "ongoing agency

4    action."  However, the agency action was the amendment of current forest plans to

5    incorporate management standards for Canada lynx which continue to be applied at the

6    site-specific project level.  The question, as in Turtle Is. and Jewell, was whether the

7    agency retained sufficient discretionary involvement or control over existing agency

8    action.  None of these cases involved a situation (as here) where the only relevant

9    agency action targeted by the plaintiff previously expired and the agency took no further

10   affirmative action.

11        The claim that the EPA failed to reinitiate consultation regarding the issuance of

12   the 2011 Permit to Operate also fails, because the 2011 PTO was issued by BAAQMD,

13   not EPA, see Cplt ¶ 39, and it was issued under state and local law.  The § 7(a)(2)

14   consultation requirement applies only to actions authorized, funded, or carried out by

15   federal agencies.  See 16 U.S.C. § 1536(a)(2); see also Nat'l Ass'n of Home Builders v.

16   Defenders of Wildlife, 551 U.S. 644, 653 (2007) (the ESA's § 7(a)(2) consultation

17   requirement "does not apply to permitting decisions by state authorities").

18        Wild Equity appears to be attempting to argue around this barrier by claiming that

19   BAAQMD incorporated "certain PSD requirements" into the 2011 Permit to Operate.

20   However, BAAQMD's PTO – which is based solely on state and local law – is not imbued

21   with the character of a federal CAA PSD permit by virtue of its inclusion of requirements

22   that might otherwise have been imposed through a PSD permitting process.  As

23   explained above, while PSD permitting is governed by the federal regulatory program in

24   the Bay Area, the BAAQMD implements a separate state implementation plan-approved

25   Clean Air Act program under which it issues ATC permits.

26        That is, the PSD and ATC programs are distinct, with the latter being implemented

27   under state and local law, and the former being implemented under federal law.  The

28   ESA § 7 consultation requirement "does not apply to permitting decisions by state

1    authorities." Home Builders, 551 U.S. at 653.  While the BAAQMD may have a practice

2    of issuing combined permits, that cannot federalize the state and local components of the

3    permit for purposes of ESA § 7's focus on federal agency actions.

4         The Consent Decree imposed new emission limitations and requirements for

5    certain pollutants, which were more stringent than the terms and conditions included in

6    the previously issued 2001 PSD/ATC permit.  See PG&E, 776 F. Supp. 2d at 1015-16.

7    However, it is equally clear that the Consent Decree did not require or otherwise result in

8    issuance of a new or revised federal PSD permit for the Gateway facility.  See id. at

9    1027.  Instead, PG&E was required to seek amendment of its applicable state and local

10   permits, as well as to include the new emission limitations and requirements as part of its

11   future permit application to BAAQMD.  The Consent Decree did not require any additional

12   federal permitting action, under PSD or otherwise, and no such action has occurred, and

13   Wild Equity cannot manufacture a federal action for purposes of an ESA § 7 claim where

14   no such action exists.

15        To the extent that Wild Equity is arguing that the EPA was required to revise the

16   PSD components of the 2001 PSD/ATC permit or issue a new PSD permit instead of

17   imposing new emission limitations and requirements through the Consent Decree, the

18   PG&E court already considered and rejected such an argument from CBE.  See PG&E,

19   776 F. Supp. 2d at 1027.  Thus, despite Wild Equity's attempt to characterize the

20   emission limitations and requirements resulting from the Consent Decree as "PSD

21   requirements," it is clear from the PG&E decision and the Consent Decree that no new

22   PSD permitting process occurred and there is no federal agency action related to the

23   2011 Permit to Operate that could trigger ESA § 7(a)(2) consultation.

24        Finally, Wild Equity asserts, the applicable regulations also state that the EPA has

25   discretion to amend PSD permitting as necessary.  In support, Wild Equity cites 40

26   C.F.R. § 71.7(f)(1)(iv).  This provision does not help Wild Equity's position, as it relates to

27   reopening and revising of permits prior to their expiration.

28        Wild Equity has not identified a final "agency action" that can be challenged, but

21

even if it had, a claim challenging a final EPA action can only be pursued in the form of a petition in the court of appeals.  See Cal. Dump Truck Owners Ass'n, 784 F.3d 500, 506-07 & n.8 (9th Cir. 2015) (citing 42 U.S.C. § 7607(b)(1)).  That would include any challenge to issuance of a PSD permit.

### CONCLUSION

In accordance with the foregoing, the EPA's motion is GRANTED.  Wild Equity requests leave to amend the complaint "to conform it with [the] response to EPA's motion to dismiss."  Wild Equity's Opp. at 5 n.3.  However, Wild Equity offers no new proposed facts, and the court finds that amendment would be futile.  Accordingly, the dismissal is WITH PREJUDICE.

**IT IS SO ORDERED.**

Dated:  November 20, 2015

_____
PHYLLIS J. HAMILTON
United States District Judge

United States District Court
Northern District of California

22